1  ROBBINS GELLER RUDMAN
    & DOWD LLP
2  DAVID C. WALTON (167268)
   BRIAN E. COCHRAN (286202)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101-8498
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  dwalton@rgrdlaw.com
   bcochran@rgrdlaw.com
6      – and –
   SAMUEL H. RUDMAN
7  DAVID A. ROSENFELD
   58 South Service Road, Suite 200
8  Melville, NY 11747
   Telephone: 631/367-7100
9  631/367-1173 (fax)
   srudman@rgrdlaw.com
10 drosenfield@rgrdlaw.com

11 Attorneys for Plaintiff

12 [Additional counsel appear on signature page.]

13                UNITED STATES DISTRICT COURT

14               CENTRAL DISTRICT OF CALIFORNIA

15 INTER-MARKETING GROUP USA,      ) Case No.
   INC., Individually and on Behalf of All )
16 Others Similarly Situated,           ) CLASS ACTION
                                        )
17                      Plaintiff,       ) COMPLAINT FOR VIOLATIONS OF
                                        ) THE FEDERAL SECURITIES LAWS
18       vs.                            )
                                        )
19 THIRD AVENUE TRUST, THIRD          )
   AVENUE MANAGEMENT LLC, M.J.        )
20 WHITMAN LLC, MARTIN J.             )
   WHITMAN, DAVID M. BARSE,           )
21 VINCENT J. DUGAN, WILLIAM E.       )
   CHAPMAN, II, LUCINDA FRANKS,       )
22 EDWARD J. KAIER, ERIC              )
   RAKOWSKI, MARTIN SHUBIK,           )
23 CHARLES C. WALDEN and              )
   PATRICK REINKEMEYER,               )
24                                      )
                        Defendants.     )
25 _____) DEMAND FOR JURY TRIAL

26

27

28

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Third Avenue Trust ("Third Avenue" or the "Trust"), as well as media and analyst reports about the Trust and Trust press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act of 1933 (the "1933 Act") [15 U.S.C. §77v].

2.    The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o]. In connection with the acts complained of, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

3.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the acts complained of herein occurred in this District, including the dissemination of defendants' false and misleading statements into this District and the purchase of artificially inflated Fund (as defined below) shares by investors residing in this District. A complaint seeking substantially similar relief by a person purporting to be a shareholder of the Fund and to be a resident of this District was filed in this District on January 27, 2016. *See Tran v. Third Avenue Management LLC, et. al*, No. 16-cv-00602 (C.D. Cal.).

**NATURE OF THE ACTION**

4.     This is a securities class action on behalf of all purchasers of Third Avenue Focused Credit Fund Investor Class shares ("TFCVX") and Third Avenue Focused Credit Fund Institutional Class shares ("TFCIX") between March 1, 2013 and December 10, 2015, inclusive (the "Class Period"), against Third Avenue, certain of its officers and/or trustees, its investment advisor, Third Avenue Management LLC ("Third Avenue Management"), and M.J. Whitman LLC, Third Avenue Management's affiliated broker-dealer, for violations of the 1933 Act.

5.     Third Avenue is an open-ended management investment company focused on value investing, and specifically the purchase of undervalued assets based on fundamental analysis.  Third Avenue Focused Credit Fund ("Focused Credit Fund" or the "Fund") is a mutual fund within the Third Avenue family of investment funds that seeks to achieve long-term total returns mainly by investing in bonds and other types of credit instruments, including in a substantial proportion of non-investment grade assets commonly known as "high-yield" or "junk" bonds.

6.     Third Avenue is registered with the SEC as an open-ended investment company under the Investment Company Act of 1940 ("ICA").  As such, its series of investment funds, including the Focused Credit Fund, are subject to the rules and regulations governing mutual funds under the ICA.  The SEC lists the ability of investors to readily redeem their shares as one of the "traditional, distinguishing characteristics of mutual funds" on its website.[1]  Codifying this key characteristic, ICA §22(e) states that mutual funds must stand ready to redeem shares daily and pay redeeming shareholders within seven days of receiving a redemption request.  In order to ensure a mutual fund will be able to timely satisfy investor redemption requests, at least 85% of its assets must be "liquid" under SEC guidelines.  *See Revisions of*

---

[1]   *See* U.S. Securities and Exchange Commission, *Invest Wisely: An Introduction to Mutual Funds*, http://www.sec.gov/investor/pubs/inwsmf.htm#key (last visited Feb. 1, 2016).

*Guidelines to Form N-1A*, SEC Release No. 33-6927; IC-18612, 1992 SEC LEXIS 1083 (Mar. 12, 1992) ("SEC Release No. 33-6927"). A security is defined as "illiquid" if a fund cannot receive the amount at which it values the asset within seven days. *See Acquisition and Valuation of Certain Portfolio Instruments by Registered Investment Companies,* SEC Release No. IC-14983, 1986 SEC LEXIS 2317 (Mar. 21, 1986) ("SEC Release No. IC-14983").

7. Since its launch in August 2009, the Focused Credit Fund has promised investors access to higher yielding distressed debt investments, while purporting to maintain the liquidity and share redemption guarantees of a traditional mutual fund. For example, the Fund's prospectus and registration statement (together with all amendments and supplements thereto, the "Offering Materials") stated that investors in the Fund would be able to "redeem [their] shares on any day during which the NYSE is open," and that the "Fund will usually make payment for redemptions of Fund shares within one business day, but not later than seven calendar days, after receipt of a redemption request." The Offering Materials also stated that throughout the Class Period, the Fund maintained only a small proportion of its investments in illiquid securities and at no point held more than the 15% threshold set by the SEC. The Offering Materials also stated that only a small proportion of the Fund's assets were "not readily marketable" for "which market quotations are not readily available."

8. These statements were false and misleading when made. Specifically, defendants failed to disclose that the Fund had taken on excessive amounts of illiquid securities as it grew in size, more than tripling from approximately $1 billion in assets to approximately $3.5 billion in assets from 2012 to 2014. As a result, the Fund became heavily concentrated in assets for which no market readily existed, subjecting the Fund and investor capital to undisclosed risks of outsized investment losses and to the impairment of shareholders' redemption rights in the event of a market downturn or a run of redemption activity.

9.      As the junk bond market experienced negative trends in the summer of 2014 and redemptions picked up, the Fund entered a "death spiral" of its own making. While the Fund continued to outwardly represent that it was abiding by the SEC's 15% liquidity rule and had sufficient liquidity to cover investor redemptions, it internally found it could not sell its positions at prices reasonably reflecting the value it had attributed to them, causing it to sell its most liquid assets to cover investor redemptions, thereby increasing its concentration of illiquid and underperforming assets and further impairing its ability to meet future redemptions.   By early December, the Fund was down 27% on the year, compared to less than 4% for high-yield funds as a category, according to Morningstar.

10.     By December 10, 2015, the incongruence between the Fund's internal investment strategy and outward obligations as a mutual fund reached a breaking point.  On that day, Third Avenue shocked the investment community by announcing that it had completely frozen investor withdrawals and shifted all Fund assets into a liquidating trust.  The Company had taken this unprecedented step without seeking prior SEC approval.  Third Avenue stated that it may take a "year or more" for investors with money still locked in the Fund to get their money back (assuming they are able to get their money back at all).

11.     The news sparked a rout in high-yield debt markets.  Illustrative of market commentary, *Dow Jones* called the move "highly unorthodox," with *The Wall Street Journal* stating that it would have potentially "significant repercussions for both the company and the mutual-fund industry, ***which for decades has thrived by promising to allow investors to take a long-term view of the markets while retaining the right to cash out shares at any time***."[2]

12.     Shortly thereafter, defendant David M. Barse ("Barse"), the Chief Executive Officer ("CEO") of Third Avenue Management, was fired.

---

[2]   All emphasis has been added unless otherwise noted.

13.    On December 16, 2015, Third Avenue Management issued a second letter to shareholders stating that it had struck a belated deal with the SEC requiring it to transfer assets back into the Focused Credit Fund so that investors could receive more transparency on the liquidation, while the Fund continued to freeze redemption requests.  The letter also stated that the initial shareholder distribution would include only 9% of the Fund's remaining capital, indicating that the Fund *could not quickly sell 91% of its assets* at reasonable or above fire-sale prices.  *The Wall Street Journal* would later report, citing a former employee who had worked with defendant Barse, that Barse had internally "voiced some concern about the risk of holding hard-to-sell assets while allowing investors to sell out in a day" and "'was worried about the mismatch.'"  Unfortunately, Barse and the rest of the defendants did not share their concerns with the Fund's investors until it was too late and the value of the Fund's assets were in freefall with their investments locked-in for the ride.

14.    As its previously undisclosed liquidity problems, concentration of high-risk and overvalued assets, and redemption shortcomings came to light, the value of the Fund's shares plummeted.  For example, on December 10, 2015, TFCIX shares closed at $6.46 per share and TFCVX shares closed at $6.48 per share,[3] more than 45% below their Class Period highs.

## PARTIES

15.    Plaintiff Inter-Marketing Group USA, Inc. acquired the Fund's shares pursuant to one or more of the Offering Materials at issue as set forth in the attached certification and has been damaged thereby.

16.    Defendant Third Avenue is an open-ended investment company with several investment funds, including the Focused Credit Fund.  Third Avenue is

---

[3]    The share prices for TFCIX and TFCVX are determined by the Fund's daily net asset value per share, or "NAV."

1 organized under the laws of Delaware pursuant to a Trust Instrument dated October
2 31, 1996.

3      17.    Defendant Third Avenue Management is an investment advisor to private
4 and institutional clients, including defendant Third Avenue.

5      18.    Defendant M.J. Whitman LLC (the "Distributor"), is an affiliate of Third
6 Avenue Management and was, during the relevant time period, the principal
7 underwriter and distributor for shares of the Fund. The Distributor also served as
8 Third Avenue's agent for the purpose of the continuous public offering of the Fund's
9 shares.

10      19.    Defendant Martin J. Whitman ("Whitman") was at all relevant times the
11 Chairman of the Board of Trustees of the Fund and signed each Registration
12 Statement effective during the Class Period.

13      20.    Defendant Barse was at all relevant times CEO, President, Investment
14 Advisor and a Trustee of Third Avenue until he was fired in December 2015.  Barse
15 signed each Registration Statement effective during the Class Period.

16      21.    Defendant Vincent J. Dugan ("Dugan") was at all relevant times Chief
17 Financial Officer ("CFO") and Investment Manager of Third Avenue, and also sat on
18 the Valuation Committee of the Focused Credit Fund.  Dugan signed each
19 Registration Statement effective during the Class Period.

20      22.    Defendant William E. Chapman, II ("Chapman") was at all relevant
21 times a Trustee of Third Avenue and signed each Registration Statement effective
22 during the Class Period.

23      23.    Defendant Lucinda Franks ("Franks") was at all relevant times a Trustee
24 of Third Avenue and signed each Registration Statement effective during the Class
25 Period.

26      24.    Defendant Edward J. Kaier ("Kaier") was at all relevant times a Trustee
27 of Third Avenue and signed each Registration Statement effective during the Class
28 Period.

25.     Defendant Eric Rakowski ("Rakowski") was at all relevant times a Trustee of Third Avenue and signed each Registration Statement effective during the Class Period.

26.     Defendant Martin Shubik ("Shubik") was at all relevant times a Trustee of Third Avenue and signed each Registration Statement effective during the Class Period.

27.     Defendant Charles C. Walden ("Walden") was at all relevant times a Trustee of Third Avenue and signed each Registration Statement effective during the Class Period.

28.     Defendant Patrick Reinkemeyer ("Reinkemeyer") has served since January 2015 and at all relevant times thereafter as a Trustee of Third Avenue and signed the 2015 Offering Materials and amendments thereto effective during the Class Period.

29.     The defendants referenced above in ¶¶19-28 are referred to herein as the "Individual Defendants."

**BACKGROUND**

30.     Third Avenue is an open-end management investment company organized as a Delaware business trust pursuant to a Trust Instrument dated October 31, 1996. The Trust currently consists of five non-diversified (within the meaning of §5(b)(2) of the ICA) separate investment series, each with their own investment strategy, and purports to employ a "strict value discipline" approach to investing.

31.     The Focused Credit Fund is a mutual fund within the Third Avenue family of investment series. The Fund sought to achieve its long-term total return objective mainly by investing in bonds and other types of credit instruments and to invest a substantial amount of its assets in credit instruments that are rated below investment grade. Under normal circumstances, at least 80% of the Fund's net assets (plus the amount of any borrowing for investment purposes) would be invested in

1    bonds and other types of credit instruments, such as high-yield bonds (commonly
2    known as "junk bonds" or "junk debt").

3        32.    Investors could purchase two series of shares in the Focused Credit Fund:
4    (i) TFCVX, which required an upfront investment of at least $2,500; and (ii) TFCIX,
5    which required an upfront investment of at least $100,000, but had lower fees.

6        33.    Because of the nature of the Fund's investments, which generally have
7    limited publicly available information, it would be practically impossible for outside
8    shareholders to independently determine the value of the Fund's total reported assets.
9    For example, the Fund generally categorizes its investments as Level 1, Level 2 or
10   Level 3 based on the amount of "observable data" on valuation inputs.  Only Level 1
11   assets reflect "unadjusted quoted prices in active markets for identical assets or
12   liabilities."  Level 2 assets, by contrast, "require[] significant judgment by the Fund[]"
13   in order to determine their fair value because they are based on "[i]nputs other than
14   [observable] quoted prices," including in non-active markets.  The Fund's valuation of
15   Level 3 assets are the most opaque, because they rely on "[s]ignificant unobservable
16   inputs," and thus on assumptions by the Fund.  Over the Class Period, only a relatively
17   small proportion of the Fund's assets were categorized as Level 1.  For example, as of
18   October 31, 2013, the Fund categorized only $119 million of its total $1.6 billion in
19   portfolio assets (at fair value) as Level 1, or approximately 7.5%.

20   **Management of the Focused Credit Fund**

21       34.    Third Avenue Management is the investment adviser for Third Avenue
22   and the Focused Credit Fund pursuant to an investment advisory agreement and is
23   registered with the SEC as such under the ICA.  As a result, Third Avenue
24   Management owes the Trust and the Fund fiduciary duties, including the duty to act in
25   good faith, in the best interests of clients, to fully and fairly disclose all material facts
26   to clients, to expose and eliminate any conflicts of interest that may cause the
27   investment adviser to render advice that is not disinterested, and to affirmatively
28   employ reasonable care to avoid misleading clients.

35.    Third Avenue Management earned tens of millions of dollars in fees from Third Avenue and the Focused Credit Fund (as well as other asset portfolios under its management) for the provision of advisory, management and related services.  For example, for the fiscal year ended October 31, 2015, the Focused Credit Fund paid approximately $23 million in fees and expenses, primarily to Third Avenue Management and its employees.  Similarly, for the fiscal year ended October 31, 2014, the Fund paid approximately $29 million in fees and expenses, primarily to Third Avenue Management and its employees.

36.    During the Class Period, the Fund had no independent officers and was managed by employees of Third Avenue and Third Avenue Management and the Fund's Board of Trustees (the "Board"), including the Individual Defendants.  For example, Third Avenue Management was responsible for the Fund's investments as overseen by the Board.  The Fund also maintained a Valuation Committee, on which defendant Dugan sat, responsible for valuing the Fund's assets, and a Fair Value Committee, responsible for overseeing fair valuations pursuant to procedures and methodologies implemented and periodically reviewed by the Board.[4]  The Board was also responsible for monitoring the liquidity of the Fund to ensure that it remained within the limits set by the Board and to ensure that assets deemed "liquid" were properly categorized as such.

**Mutual Funds Must Maintain Adequate Liquidity**

37.    "Because open-end companies hold themselves out at all times as being prepared to meet redemptions within seven days," the SEC considers it "***essential*** that such companies maintain a portfolio of investments that enable them to fulfill that obligation."  ICA Release No. 5847, 1969 SEC LEXIS 812, at *15 (Oct. 21, 1969).  Section 22(e) of the ICA prohibits mutual funds from suspending the right of

---

[4]    Defendants Chapman, Franks, Kaier, Rakowski, Shubik, Walden and Reinkemeyer sat on the Fair Value Committee.

1   redemption or postponing payment of a redemption request for more than seven days

2   after a tender of shares, except in very narrow circumstances limited to:

3              (1)   for any period (A) during which the New York Stock

4         Exchange is closed other than customary week-end and holiday closings

5         or (B) during which trading on the New York Stock Exchange is

6         restricted;

7              (2)  for any period during which an emergency exists as a result of

8         which (A) disposal by the company of securities owned by it is not

9         reasonably practicable or (B) it is not reasonably practicable for such

10        company fairly to determine the value of its net assets; or

11             (3)  for such other periods as the Commission may by order permit

12        for the protection of security holders of the company.

13  Investors generally consider the easily redeemable nature of mutual fund shares as a

14  primary benefit of investing in them.[5]   In fact, the SEC considers the right of

15  redemption a "traditional, distinguishing characteristic of mutual funds."[6]

16        38.    In addition, a mutual fund must compute its NAV each business day and

17  give purchase and redemption orders the price next computed after receipt of an order.

18  *See* 17 C.F.R. 270.22c-1.  To compute an accurate NAV per share, a mutual fund must

19  be able to value each portfolio security accurately.  Mutual funds must use market

20  price to value securities for which market quotations are readily available, and the

21  board of directors must make a good faith determination of the fair value of securities

22  for which market prices are not readily available.  *See* 17 C.F.R. 270.2a-4(a)(1).

23

24  [5]   *See, e.g.*, Mark P. Cussen, *The Benefits of Mutual Funds* (Sept. 18, 2014),

25  http://mutualfunds.com/education/ benefits-of-mutual-funds/ ("Another element of

26  convenience found with mutual funds is the ability to purchase and redeem shares with relative ease.").

27  [6]   *See* U.S. Securities and Exchange Commission, *Invest Wisely: An Introduction to Mutual Funds*, http://www.sec.gov/investor/pubs/inwsmf.htm#key (last visited Feb. 1,

28  2016).

1    However, even if market quotations are not available to value certain securities,

2    mutual funds complying with generally accepted accounting principles ("GAAP") are

3    required to use market-based inputs and assumptions to the extent possible to value

4    those securities.    *See* ASC 820-10-05-1C.    If the NAV of a mutual fund is not

5    accurate, purchasing or redeeming shareholders may pay or receive too little or too

6    much for their shares, and the interests of remaining shareholders may be overvalued

7    or diluted.

8          39.    In order to meet these requirements, the SEC requires mutual funds to

9    "maintain a high degree of portfolio liquidity."    *See* SEC Release No. 33-6927, 1992

10   SEC LEXIS 1083, at *5.    As a result, current SEC guidelines set the maximum

11   amount of illiquid assets a mutual fund may hold at any given time at 15% of total

12   fund assets.    *See id.* at *9.    A security is defined as "illiquid" if a fund cannot receive

13   the amount at which it values the asset within seven days.    *See* SEC Release No. IC-

14   14983, 1986 SEC LEXIS 2317.    The SEC also has stated that open-end funds have a

15   "general responsibility to maintain a level of portfolio liquidity that is appropriate

16   under the circumstances," and to engage in ongoing portfolio liquidity monitoring "to

17   determine whether, in light of the current circumstances, an adequate level of liquidity

18   is being maintained."    *See* SEC Release No. 33-6927, 1992 SEC LEXIS 1083, at *7.

19   For example, the SEC has stated that when a fund is experiencing a net outflow of

20   assets it "should consider reducing its holdings of illiquid securities in an orderly

21   fashion in order to maintain adequate liquidity."    *Id.* at *7-*8.    As stated by Roger

22   Ibbotson, a highly regarded finance expert and emeritus professor of the practice of

23   finance at Yale School of Management, "'things that are really illiquid do not belong

24   in mutual funds.'"

25         40.    In January 2014, the SEC issued a risk management guidance update for

26   fixed income markets investing.[7]    The guidance encouraged investment advisors for

27

28   _____

[7]    *Guidance    Update*    (Jan.    2014),    http://www.sec.gov/divisions/investment/
guidance/im-guidance-2014-1.pdf.

1  bond mutual funds (such as the Focused Credit Fund) to evaluate and stress test their

2  liquidity and ability to meet investor redemption requests and to assess the adequacy

3  of their disclosures to investors regarding related risks.

4  **Relevant SEC Filings**

5          41.    On or about August 24, 2009, defendants began offering shares of the

6  Focused Credit Fund pursuant to an initial registration statement filed with the SEC.

7          42.    Defendants annually filed nearly identical Registration Statements and

8  Prospectuses throughout the Class Period in connection with the continuous offerings

9  of the Focused Credit Fund's shares.  The Fund's shares were issued to investors

10  pursuant to the following series of Registration Statements and Prospectuses that

11  formed part of the Registration Statements filed with the SEC and made effective

12  during the relevant period, which are referred to collectively herein as the "Offering

13  Materials":

14          (a)    Summary Prospectus filed February 28, 2013 and dated March 1,

15  2013;

16          (b)    Registration Statement and Prospectus filed on February 28, 2013

17  and dated March 1, 2013;

18          (c)    Post-effective amendment to the Registration Statement filed

19  March 15, 2013;

20          (d)    Summary Prospectus filed February 28, 2014;

21          (e)    Registration Statement and Prospectus filed on February 28, 2014;

22          (f)    Post-effective amendment to the Registration Statement filed

23  March 13, 2014;

24          (g)    Summary Prospectus filed February 27, 2015 and dated March 1,

25  2015;

26          (h)    Registration Statement and Prospectus filed on February 27, 2015

27  and dated March 1, 2015;

28

(i)     Post-effective amendment to the Registration Statement filed March 18, 2015;

(j)     Prospectus supplement and prospectus summary filed March 23, 2015; and

(k)     Prospectus supplement filed December 10, 2015.

43.     A statement of additional information ("SAI") and the Fund's Annual Report for that year, which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations, were incorporated by reference and filed with the Offering Materials.  The Fund filed Annual Reports with the SEC on Form N-CSR on December 30, 2013, January 6, 2015 and December 24, 2015, and stand-alone SAIs on June 11, 2014, March 2, 2015, March 23, 2015 and October 15, 2015, and Semi-Annual and Quarterly reports which were part of the Offering Materials.

44.     The Offering Materials referred investors seeking more information to the SAIs, and expressly incorporated the SAIs, which "provide[] more detailed information about the Fund."  Defendants reissued and updated the SAIs throughout the relevant time period.  The Offering Materials directed investors to review the SAIs, Annual Reports and Semi-Annual Reports for additional information.  The Annual Reports included "a discussion of the market conditions and investment strategies that significantly affected the Fund['s] performance[] during the last fiscal year."

45.     Disclosure of the Fund's complete holdings is required to be made quarterly within 60 days of the end of each fiscal quarter in the Annual Report and Semi-Annual Report to Fund shareholders and in the quarterly holdings report on Form N-Q.  The Semi-Annual Reports and Form N-Qs were part of the Offering Materials.  Each member of the Class purchased shares of the Focused Credit Fund pursuant to the Offering Materials.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING MATERIALS**

46.    The Offering Materials stated that the Fund employed a "disciplined and deliberate" approach to value investing "through intensive research of individual companies," which was designed to "lower[] investment risk" and increase long-term capital appreciation in distressed assets:

> Focused Credit Fund . . . *adheres to a strict value discipline* in selecting securities and other instruments.  This means seeking investments whose market prices are low in relation to what the Fund's Adviser, Third Avenue Management . . . believes is their intrinsic value and/or whose total return potential is considered by the Adviser to be high.  *The Fund's Adviser believes this both lowers investment risk and increases capital appreciation and total return potential*.  The Fund identifies investment opportunities through intensive research of individual companies and generally does not focus solely on market conditions and other macro factors.  For these reasons, the Fund may seek investments in the debt or other securities of companies in industries that are believed to be temporarily depressed.

47.    The Offering Materials stated that the "Third Avenue Focused Credit Fund may be appropriate for long-term investors seeking alternatives to equity investments for long-term total return, which may include returns from a combination of sources including capital appreciation, fees and interest income."

48.    In addition, the Offering Materials stated the Fund's share prices would be set by the Fund's NAV, calculated daily, generally "*using the most readily available market price*," *i.e.*, the "*market value*" of the Fund's investments.  For those illiquid investments for which no "market quotations" were readily available or deemed unreliable, the Fund's Board would determine their "fair value" in good faith

1  and according to pre-determined procedures, including in-depth reviews by the Fair

2  Value Committee of the Board.

3       49.    The Offering Materials also stated that investors would be able to

4  "*redeem [their] shares on any day during which the NYSE is open*, either directly

5  from the Fund or through certain broker-dealers or other financial intermediaries."

6  The Offering Materials further stated that the Fund would "usually make payment for

7  redemptions of Fund shares within one business day, *but not later than seven*

8  *calendar days*, after receipt of a redemption request."

9       50.    The SAI set out narrow circumstances under which the right of

10  redemption may be deferred for greater than seven days, which generally tracked the

11  exceptions listed in ICA §22(e):

12      •    (a)  "when trading on the New York Stock Exchange ("NYSE") is
13           restricted";

14      •    (b)  "when the NYSE is closed for other than weekends and holidays";

15      •    (c)  "when the SEC has by order permitted such suspension"; or

16      •    "when an emergency exists making disposal of portfolio securities or
17           valuation of net assets of the Fund not reasonably practicable; provided
18           that applicable rules and regulations of the SEC shall govern as to
19           whether the conditions prescribed [above] exist."

20      51.    The Fund did not disclose that redemptions could be suspended

21  unilaterally by Third Avenue as to all shareholders and for an indefinite duration, or

22  due to an "emergency" of Third Avenue's own creation caused by it taking on

23  undisclosed investment concentration and liquidity risks.  To the contrary, the SAI

24  stated that the Fund "*will not purchase or otherwise acquire any investment if, as a*

25  *result, more than 15% of its net assets (taken at current market value) would be*

26  *invested in securities that are illiquid*."   The SAI defined an illiquid asset or

27  investment as any which the Fund "*cannot sell a normal trading unit in the ordinary*

28  *course of business within seven days* at approximately the value at which the Fund

has valued the asset or investment, including securities that cannot be sold publicly due to legal or contractual restrictions." The SAI also stated that the Board would "*monitor*" the liquidity of the Fund's investments to ensure securities deemed liquid are "*freely salable*," including a "*review [of] pertinent factors such as trading activity, reliability of price information and trading patterns of comparable securities*."

52. On March 7, 2013, Third Avenue filed its quarterly report for the Fund for the period ended January 31, 2013 with the SEC on Form N-Q (the "1Q13 N-Q"). The 1Q13 N-Q stated that at period end the Fund had approximately $1 billion in net assets, with an NAV per share of $10.79 for TFCVX shares and $10.78 for TFCIX shares. The "fair value" of the Fund's assets was defined as "*the price that a Fund would receive upon selling an investment in an orderly transaction to an independent buyer* in the principal or most advantageous market for the investment under current market conditions." The 1Q13 N-Q also stated that the Fund could only invest "*up to 15% of its total net assets* in securities which are not readily marketable, including those which are restricted as to disposition under applicable securities laws ('restricted securities')." It also stated that "[r]estricted securities and other securities and assets for which market quotations are not readily available are valued at 'fair value', determined in good faith by the Trust's Valuation Committee as authorized by the Board of the Trust, under procedures established by the Board." The 1Q13 N-Q stated that "*$0 or 0.00% of net assets*" for the Fund were calculated at fair value under this definition at period end.[8]

53. On June 25, 2013, Third Avenue filed its semi-annual report for the Fund for the period ended April 30, 2013 with the SEC on Form N-CSRS (the "2013 Semi-Annual Report"). The 2013 Semi-Annual Report stated that at period end the Fund

---

[8] These definitions of "fair value," "liquidity" and securities for which "market quotations are not readily available" were used in the Fund's periodic financial filings throughout the Class Period.

had approximately $1.2 billion in net assets, with an NAV per share of $11.21 for TFCVX shares and $11.20 for TFCIX shares, and reiterated the Fund's purportedly "***disciplined and deliberate investing approach***." The 2013 Semi-Annual Report also stated that the Fund could only invest "***up to 15% of its total net assets*** in securities which are not readily marketable." The 2013 Semi-Annual Report stated that only "***$1,409,667 or 0.12% of net assets***" for the Fund were calculated at fair value for "which market quotations are not readily available" at period end.

54.    On September 19, 2013, Third Avenue filed its quarterly report for the Fund for the period ended July 31, 2013 with the SEC on Form N-Q (the "3Q13 N-Q"). The 3Q13 N-Q stated that at period end the Fund had approximately $1.3 billion in net assets, with an NAV per share of $11.00 for TFCVX shares and $10.99 for TFCIX shares. The 3Q13 N-Q also stated that the Fund could only invest "***up to 15% of its total net assets*** in securities which are not readily marketable." The 3Q13 N-Q stated that "***$0 or 0.00% of net assets***" for the Fund were calculated at fair value for "which market quotations are not readily available" at period end.

55.    On December 30, 2013, Third Avenue filed its annual report for the Fund for the period ended October 31, 2013 with the SEC on Form N-CSR (the "2013 Annual Report"). The 2013 Annual Report stated that at period end the Fund had approximately $1.8 billion in net assets, with an NAV per share of $11.08 for TFCVX shares and $11.07 for TFCIX shares, and generated a 16.61% and 16.91% return for each investor class, respectively, over the fiscal year. The 2013 Annual Report also reiterated the Fund's purportedly "***disciplined and deliberate investing approach***" and its valuation policies and procedures described in the Offering Materials, including the regular review by Board committee to ensure investment liquidity and the reliability of fair value determinations and other valuations. The 2013 Annual Report also stated that the Fund could only invest "***up to 15% of its total net assets*** in securities which are not readily marketable." The 2013 Annual Report stated that only "***$9,713,252 or***

1  **0.55% of the net assets**" for the Fund were calculated at fair value for "which market
2  quotations are not readily available" at period end.

3      56.    On March 12, 2014, Third Avenue filed its quarterly report for the Fund
4  for the period ended January 31, 2014 with the SEC on Form N-Q (the "1Q14 N-Q").
5  The 1Q14 N-Q stated that the Fund could only invest "**up to 15% of its total net assets**
6  in securities which are not readily marketable."  The 1Q14 N-Q stated that only
7  "**$21,281,220 or 0.92%**" of net assets for the Fund were calculated at fair value for
8  "which market quotations are not readily available" at period end.

9      57.    On June 20, 2014, Third Avenue filed its semi-annual report for the Fund
10  for the period ended April 30, 2014 with the SEC on Form N-CSRS (the "2014 Semi-
11  Annual Report").  The 2014 Semi-Annual Report stated that at period end the Fund
12  had approximately $3 billion in net assets, with an NAV per share of $11.95 for
13  TFCVX shares and $11.94 for TFCIX shares, and reiterated the Fund's purportedly
14  "**disciplined and deliberate investing approach**."  The 2014 Semi-Annual Report also
15  stated that the Fund could only invest "**up to 15% of its total net assets** in securities
16  which are not readily marketable."  The 2014 Semi-Annual Report stated that only
17  "**$82,524,097 or 2.69% of net assets**" for the Fund were calculated at fair value for
18  "which market quotations are not readily available" at period end.

19      58.    On September 16, 2014, Third Avenue filed its quarterly report for the
20  Fund for the period ended July 31, 2014 with the SEC on Form N-Q (the "3Q14
21  N-Q").  The 3Q14 N-Q stated that at period end the Fund had approximately $3.5
22  billion in net assets, with an NAV per share of $12.02 for TFCVX shares and $12.01
23  for TFCIX shares.  The 3Q14 N-Q also stated that the Fund could only invest "**up to
24  15% of its total net assets** in securities which are not readily marketable."  The 3Q14
25  N-Q stated that only "**$162,798,833 or 4.60% of net assets**" for the Fund were
26  calculated at fair value for "which market quotations are not readily available" at
27  period end.

28

59.     On January 6, 2015, Third Avenue filed its annual report for the Fund for the period ended October 31, 2014 with the SEC on Form N-CSR (the "2014 Annual Report"). The 2014 Annual Report stated that at period end the Fund had approximately $3 billion in net assets, with an NAV per share of $10.61 for TFCVX shares and $10.60 for TFCIX shares, and generated a 2.67% and 2.93% return for each investor class, respectively, over the fiscal year. The 2014 Annual Report also reiterated the Fund's purportedly "***disciplined and deliberate investing approach***" and its valuation policies and procedures described in the Offering Materials, including the regular review by Board committee to ensure investment liquidity and the reliability of fair value determinations and other valuations. The 2014 Annual Report also stated that the Fund could only invest "***up to 15% of its total net assets*** in securities which are not readily marketable." The 2014 Annual Report stated that only "***$136,136,872 or 4.58% of net assets***" for the Fund were calculated at fair value for "which market quotations are not readily available" at period end. In addition, the 2014 Annual Report stated that at period end the Fund had ***only "14.25%" in illiquid securities***, which the report described as "liquidity risk" from "investments in private debt instruments, restricted securities, and securities having substantial market and/or credit risk ***which may be difficult to sell*** at certain periods of time and thus may not be able to dispose of at the value the Fund places on them."[9]

60.     On March 16, 2015, Third Avenue filed its quarterly report for the Fund for the period ended January 31, 2015 with the SEC on Form N-Q (the "1Q15 N-Q"). The 1Q15 N-Q stated that at period end the Fund had approximately $2.4 billion in net assets, with an NAV per share of $9.50 for TFCVX shares and $9.49 for TFCIX shares. The 1Q15 N-Q also stated that the Fund could only invest "***up to 15% of its total net assets*** in securities which are not readily marketable." The 1Q15 N-Q stated

---

[9]    This appears to be the first time that Third Avenue had specifically disclosed the proportion of illiquid assets of the Fund.

1    that only "***$101,999,735 or 4.31%***" of net assets for the Fund were calculated at fair

2    value for "which market quotations are not readily available" at period end.

3         61.    On June 26, 2015, Third Avenue filed its semi-annual report for the Fund

4    for the period ended April 30, 2015 with the SEC on Form N-CSRS (the "2015 Semi-

5    Annual Report"). The 2015 Semi-Annual Report stated that at period end the Fund

6    had approximately $2.5 billion in net assets, with an NAV per share of $9.40 for

7    TFCVX shares and $9.39 for TFCIX shares, and reiterated the Fund's purportedly

8    "***disciplined and deliberate investing approach***." The 2015 Semi-Annual Report also

9    stated that the Fund could only invest "***up to 15% of its total net assets*** in securities

10    which are not readily marketable." The 2015 Semi-Annual Report stated that only

11    "***$167,108,679 or 6.78% of net assets***" for the Fund were calculated at fair value for

12    "which market quotations are not readily available" at period end. In addition, the

13    2015 Semi-Annual Report stated that at period end the Fund had ***only "12.22%" in***

14    ***illiquid securities***. Thus, not only did defendants state that the amount of illiquid

15    securities in the Fund's portfolio was well below the threshold at which investors'

16    right of redemption may be put at risk as determined by the SEC, but also that

17    liquidity in the portfolio had actually ***improved by more than 14%*** in the six months

18    since the end of the previous fiscal year.

19         62.    On September 25, 2015, Third Avenue filed its quarterly report for the

20    Fund for the period ended July 31, 2015 with the SEC on Form N-Q (the "3Q15

21    N-Q").[10] The 3Q15 N-Q stated that at period end the Fund had approximately $2

22

23    [10]   This filing came less than a week after the SEC proposed new rules for mutual

24    funds on September 22, 2015, which would require such funds to implement liquidity risk management programs and enhance disclosure regarding fund liquidity and redemption practices. *See* Press Release, U.S. Securities and Exchange Commission,

25    *SEC Proposes Liquidity Management Rules for Mutual Funds and ETFs* (Sept. 22, 2015). These proposals placed the shareholder right of redemption front and center,

26    and became a major topic of discussion among mutual fund investors, advisors and other market commentators in the weeks that followed. *See, e.g.*, U.S. Securities and

27    Exchange Commission, *The SEC & New Liquidity Management Rules* (Oct. 20, 2015), http://mutualfunds.com/news/2015/10/20/the-sec-new-liquidity-management-

28    rules/.

billion in net assets, with an NAV per share of $8.93 for TFCVX shares and $8.92 for TFCIX shares.  The 3Q15 N-Q also stated that the Fund could only invest "***up to 15% of its total net assets*** in securities which are not readily marketable."  It also stated that only "***$191,455,179 or 9.13% of net assets***" for the Fund were calculated at fair value for "which market quotations are not readily available" at period end.

63.    Defendants' statements in ¶¶46-62 were false and misleading when made.  Defendants knew and/or recklessly disregarded, but failed to disclose, the following adverse facts:

(a)    The Fund had materially understated the proportion of illiquid assets in its investment holdings, which far exceeded the 15% limit set by SEC guidelines and reiterated in the Fund's Offering Materials and periodic financial filings;

(b)    The Fund had concentrated its positions in the securities of relatively few issuers for which no market readily existed, presenting an undisclosed risk that the Fund would not be able to sell its positions quickly or at desirable prices, thereby magnifying the illiquidity of the Fund and decreasing the value of the Fund's holdings;

(c)    The Fund's NAV was artificially inflated in that the Fund's investments did not have, and could not reasonably have had, the market valuations attributable to them under the valuation guidelines and procedures purportedly used by defendants;

(d)    The Fund's internal controls for valuing securities and the liquidity of its investments were deficient; and

(e)    As a result of (a)-(d), the Fund's shareholders were subject to the material undisclosed risk that they would not be able to redeem their shares at all and/or for an indefinite period of time in the event of a market downturn or a period of high investor redemptions.

64.     Then, on December 10, 2015, Third Avenue stunned the investment community when it issued a letter to shareholders stating that it had completely frozen share redemptions in the Fund.  The letter stated that Fund assets had been placed into a liquidating trust and would be liquidated over a period of months, which "*may take up to a year or more* before a final distribution is made in order to achieve favorable results."  The letter claimed that the drastic action had been necessitated due to the number of redemption requests and "the general reduction of liquidity in the fixed income markets [which had] *made it impracticable for [the Fund] going forward to create sufficient cash to pay anticipated redemptions without resorting to sales at prices that would unfairly disadvantage the remaining shareholders*."  The letter also blamed the Fund's investments in companies "that have undergone restructurings in the last eighteen months" that it could not sell at reasonable prices.

65.     The move shocked the investment community and precipitated a rout in high-yield bond markets.  A December 11, 2015 *BloombergBusiness* article headlined "Third Avenue Redemption Freeze Sends Chill Through Credit Market," called the move "'highly unusual'" and quoted an investment advisor at another credit fund who stated, "'*We're looking at some real carnage in the junk-bond market*.'"  Similarly, a *Dow Jones* report called the redemption freeze "highly unorthodox," which "helped fuel a junk-bond market selloff amid a wave of investor withdrawals from poorly performing funds."  *The Wall Street Journal* likewise wrote that "Third Avenue's decision to wind down the mutual fund without giving investors all their cash back could have significant repercussions for both the company and the mutual-fund industry, *which for decades has thrived by promising to allow investors to take a long-term view of the markets while retaining the right to cash out shares at any time*."  It also reported that the Fund was "*the first mutual-fund to halt redemptions without obtaining an SEC order authorizing the move*."

66.     By December 11, 2015, defendant Barse had been fired.

- 22 -

67.    On December 16, 2015, Third Avenue issued a second letter to shareholders stating that it had struck a belated deal with the SEC that would require it to transfer assets back into the Focused Credit Fund so that investors could receive more transparency on the liquidation, while continuing to freeze redemption requests. The letter also stated that the initial shareholder distribution would ***include only 9% of the Fund's capital***, indicating that the Fund could not quickly sell 91% of its assets at reasonable or above fire-sale prices.

68.    Later reporting would reveal that the problems at the Focused Credit Fund were unique to its overly aggressive investing strategy and not macroeconomic factors.  For example, a December 14, 2015 *Wall Street Journal* article stated the Fund "was significantly more aggressive than other junk bond mutual funds."  "More than half the bonds it held paid annual coupons of over 10%, while the average high-yield fund had less than 5% of its assets in that category."  The Fund also reportedly "scooped up large amounts of distressed debt and unrated securities, [becoming] the largest holder of certain loans and securities that traded infrequently, according to a person familiar with the matter."  When the Fund tried to sell these concentrated positions, "***savvy traders . . . quickly figure[d] out that a large investor was under pressure to sell***" and offered "***lowball bids for some of its assets, which would have caused it to absorb big losses if it sold at those prices***."  For example, it was reported that Barry Kupferberg, head of research at hedge fund Trilogy Capital, purchased the Fund's private equity position in Longview Power LLC, a low-cost coal-burning power plant in West Virginia, ***at a more-than-40% discount*** to the $8 price at which the shares were quoted.

69.    According to *The Wall Street Journal*, as far back as the spring of 2014 when the Fund reached its peak of approximately $3.5 billion in assets, an investor had approached the Fund's portfolio manager, Thomas Lapointe, out of concern that the Fund had grown too large.  Lapointe reportedly responded that he "was dealing" with the growth even as he allowed the Fund to take more of investors' money.

70.     *The Wall Street Journal* also reported that defendant Barse himself, citing a former employee who worked with him, internally "***voiced some concern about the risk of holding hard-to-sell assets while allowing investors to sell out in a day***" and "'***was worried about the mismatch***.'"    Unfortunately for the Fund's outside shareholders, these internal concerns and warning signs were not made public until it was too late.

71.     On December 24, 2015, Third Avenue filed its annual report for the period ended October 31, 2015 with the SEC on Form N-CSR (the "2015 Annual Report").  The 2015 Annual Report revealed that the Fund's net assets had plummeted to $1.4 billion by period end, and that the Fund had suffered approximately ***-19% returns*** for the year, compared to Barclays Capital U.S. Corporate High Yield Index and the Credit Suisse Leveraged Loan Index returns of -1.94% and 0.81%, respectively, for the same period.  The 2015 Annual Report cited temporary and permanent impairments in a number of Fund assets as among the reasons for the Fund's abysmal performance.

72.     Separately, Morningstar would report that by December 2015 the Fund's performance had further deteriorated, and that the Fund was ***down 27%*** on the year compared to less than 4% among high-yield funds as a category.

73.     The Massachusetts Secretary of State and the SEC have opened investigations into the Fund's collapse.

74.     By close of December 10, 2015 (after the Fund had suspended redemptions), TFCVX closed at $6.48 per share and TFCIX closed at $6.46 per share, more than 45% below their Class Period highs.

**CLASS ACTION ALLEGATIONS**

75.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired TFCVX and TFCIX shares during the Class Period (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the

Trust, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  As of October 31, 2015, there were over 52 million TFCVX shares and over 122 million TFCIX shares outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Third Avenue or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.     Common questions of law and fact predominate and include: (i) whether defendants violated the 1933 Act; (ii) whether defendants omitted and/or misrepresented material facts; and (iii) the extent and appropriate measure of damages.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

80.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

# COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

81.     Plaintiff incorporates all allegations in ¶¶1-80 above by reference.

82.     This Count is brought pursuant to §11 of the 1933 Act on behalf of the Class, against all defendants.

83.     The Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

84.     Third Avenue is the registrant for the shares of the Fund, and as such is strictly liable for the false statements contained in the Registration Statements.  The defendants named herein were responsible for the contents and dissemination of the Registration Statements.

85.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

86.     By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

87.     Plaintiff acquired shares of the Fund during the Class Period and pursuant to the Registration Statements.

88.     Plaintiff and the Class have sustained damages.  The value of the shares of the Fund declined substantially subsequent to and due to defendants' violations.

89.     At the times they purchased shares of the Fund, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year had elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is

based to the time of filing of the initial complaint in this action. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time of the filing of the initial complaint.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against All Defendants

90.     Plaintiff incorporates all allegations in ¶¶1-89 above by reference.

91.     This Count is brought pursuant to §12(a)(2) of the 1933 Act on behalf of the Class, against all defendants.

92.     Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Focused Credit Fund offered pursuant to the Registration Statements, Prospectuses and other documents incorporated therein.

93.     The Prospectuses contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectuses and participating in marketing the shares of the Fund to investors.

94.     Defendants owed to the purchasers of the shares of the Fund, including Plaintiff and other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses and corresponding supplements and amendments to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants in the exercise of reasonable care should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

95.     Plaintiff and other members of the Class purchased or otherwise acquired shares of the Fund pursuant to the defective Prospectuses. Plaintiff did not know, nor

in the exercise of reasonable diligence could have known, of the untruths and omissions contained in defendants' Offering Materials.

96.    By reason of the conduct alleged herein, defendants violated, and/or controlled a person who violated, §12(a)(2) of the 1933 Act.  Accordingly, plaintiff and members of the Class who hold shares of the Fund have the right to rescind and recover the consideration paid for their shares of the Focused Credit Fund and hereby elect to rescind and tender those shares to the defendants sued herein.  Plaintiff and Class members who have sold their shares of the Fund are entitled to rescissory damages.

## COUNT III

### For Violation of §15 of the 1933 Act
### Against Third Avenue, the Individual Defendants and Third Avenue Management

97.    The Individual Defendants and Third Avenue Management acted as controlling persons of Third Avenue within the meaning of §15 of the 1933 Act.  By virtue of their positions with Third Avenue, these defendants had the power and authority to cause Third Avenue to engage in the wrongful conduct complained of herein.  Third Avenue controlled the Individual Defendants and all of its employees.  By reason of such conduct, these defendants are liable pursuant to §15 of the 1933 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding damages and interest;

C.    Awarding rescission and/or a rescissory measure of damages;

D.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

1       E.     Awarding such equitable/injunctive or other relief as the Court may deem

2 just and proper.

3 **JURY DEMAND**

4      Plaintiff demands a trial by jury.

5 DATED: February 2, 2016          ROBBINS GELLER RUDMAN
                             & DOWD LLP

6                            DAVID C. WALTON
                           BRIAN E. COCHRAN

7

8                                *s/ David C. Walton*

9                              DAVID C. WALTON

10                          655 West Broadway, Suite 1900
                         San Diego, CA 92101-8498

11                          Telephone: 619/231-1058
                         619/231-7423 (fax)

12                          ROBBINS GELLER RUDMAN
                           & DOWD LLP

13                          SAMUEL H. RUDMAN

14                          DAVID A. ROSENFELD
                         58 South Service Road, Suite 200

15                          Melville, NY 11747
                         Telephone: 631/367-7100

16                          631/367-1173 (fax)

17                          LAW OFFICES OF MARC S.
                           HENZEL

18                          MARC S. HENZEL
                         230 Old Lancaster Road, Suite B

19                          Merion Station, PA 19066
                         Telephone: 610/660-8000

20                          610/660-8080 (fax)

21                          Attorneys for Plaintiff

22 <sub>I:\Admin\CptDraft\Securities\Cpt Third Avenue.docx</sub>

23

24

25

26

27

28